F. W. MYERS & CO., INC., ET AL. v. UNITED STATES

No. 5284.—Invoices dated Montreal, Canada, January 12, 1935, etc.
Certified January 12, 1935, etc.
Entered at Rouses Point, N. Y., January 8, 1935, etc.
Entry Nos. A–1620, A–1692, etc.

First Division, Appellate Term

(Decided May 28, 1941)

*Strauss & Hedges (Eugene F. Blauvelt* of counsel) for the appellant.
*Charles D. Lawrence,* Acting Assistant Attorney General (*William J. Vitale,* special attorney), for the appellee.

Before BROWN, CLINE, and WALKER, Judges; BROWN, J., dissenting

CLINE, Judge: This is an application for review of the decision of Judge Evans (Reap. Dec. 4722) who reappraised certain skis and ski poles imported from Canada in December, 1934, and January, 1935.

Three cases were consolidated for trial at the first hearing of the case which was held before Judge McClelland. The plaintiff called Mr. Harvey E. Dodds who is the president of the manufacturing company in Montreal, Canada. He testified to the values at which the different articles were sold to customers both in Canada and in the United States; he also stated that the season for the sale of the articles began to run in February of one year and extended over to February of the next year; that a price list was issued to his salesmen but was not circulated in the trade; that when a dealer purchased an initial order of 100 pair of skis he received a discount of about 10 per centum from the list prices and on every order of that dealer throughout the season, regardless of the quantity of the subsequent order, he received the same prices; that dealers who purchased an initial order of less than 100 pairs of skis had to pay higher prices; that the usual wholesale quantity was 100 to 125 pairs of skis and 100 pairs of ski poles in the spring of the year, and the sales in the fall would consist of re-orders of smaller amounts; that during the season of 1934 and 1935 the prices of the articles in the usual wholesale quantities were the same as the invoiced and entered prices in this case, with the ex-

ception of the merchandise invoiced as "standard special ski poles" at 85 cents, Canadian currency, per pair, covered by reappraisement 110799–A, the price for that article being 90 cents per pair; that otherwise the invoice prices were the prices at which the merchandise was freely offered for sale in Canada and in the United States in the usual wholesale quantities; that the principal markets for the sale of the articles in Canada extended from the Atlantic to the Pacific Oceans; that the merchandise he handled was sold in 80 per centum of the places of business in Canada dealing in merchandise of that character.

On cross-examination the witness testified that some other concerns may have sold similar merchandise at different prices and that their usual wholesale quantities may have been different from his; that he recalled issuing a price list in which it was stated "500 pairs of skis or over, $2.00 per pair; 250 pairs to 500 pairs, $2.25 per pair; 250 pairs or less, $2.50 per pair," but that price list did not work and he put another list out which was drawn for the small buyer and he deviated from that list in certain cases; that the second price list was issued in the spring of 1934. The second price list referred to by the witness was not offered in evidence.

The defendant offered two reports of customs agents which were received in evidence over objection by counsel for the plaintiff. They were marked exhibit 1. In one of those reports, which is dated April 29, 1935, the agent quoted a price list for the season of 1934–1935 copied from the records of the manufacturing company in which some of the merchandise is given two or three prices. For instance, on page 2, under the description "Hickory Military-Dome Top—dark finish," the prices are $5.85, $6.50, and $5.55, the last price being under the heading "To T. Eaton, Ltd., Toronto, Ont."

Under the heading "Wholesale Quantity—Ski Poles" on page 5 of the report appears the following:

No special wholesale quantity in Canada, but must be good sized order to obtain the wholesale quotation. Usual order 100 pairs upward.

On both skis and ski poles manufactured by this company, the large wholesale dealer gets the lowest price. The smaller dealer is charged the higher of the two prices named in the price list.

The customs agent copied what purports to be five invoices to different Canadian purchasers of skis. The invoice to J. S. Mitchell & Co., Ltd., dated October 13, 1934, prices Military Dome Top Hickory skis at $5.85 per pair while the invoice to T. Eaton, Ltd., dated November 2, 1934, prices skis of the same description at $5.55 per pair. It is worthy of note that on the invoice covered by reappraisement 110799–A merchandise having the description "Dome top hickory skis" was invoiced at $4.70 per pair and appraised at $5.85.

The report of Frederic H. Bunting, dated June 13, 1935, which is also a part of exhibit 1, contains the following statement:

Mr. Dodds stated to the writer that the prices quoted to T. Eaton, Ltd., Robert Simpson, Ltd., McLennan, McFeely & Prior.are special prices. That no other firms in Canada could get these same prices, even if they ordered the same quantity of skis and ski poles from their company.

That the smaller dealer pays the higher of the two other wholesale prices listed in the catalogue of Harvey E. Dodds, Ltd. The larger dealer pays the lower of these two wholesale quotations for skis and ski poles.

The report contains also a schedule prepared by Mr. Dodds showing the prices at which the different articles were sold for the season 1934–1935 and the number of articles sold at each price. This schedule shows a variation in price for nearly every article. For instance, the first item covering "Skis-Ash-Military Dome Top-Dark Finish" contains ten different prices for the same article.

Judge McClelland decided the case on this record and held that the appraisement must stand since the presumption of correctness attaching to the appraiser's action has not been overcome. *F. W. Myers & Co., Inc.* v. *United States*, 71 Treas. Dec. 1247, Reap. Dec. 4015.

An application for review of the decision of the trial court was argued before Division Two of this court and it was found by that division that the customs agent's reports were not properly authenticated and should not have been received in evidence. The case was remanded for a new trial. *F. W. Myers & Co., Inc.* v. *United States*, 1 Cust. Ct. 723, Reap. Dec. 4441.

At the new trial, which was held before Judge Evans, the plaintiff called Mr. James Ware, the vice president of the manufacturing company. He testified that he had charge of the Montreal factory in 1934 and 1935 and personally directed the sales force; that the season extended from March of one year to March of the next; that the firm had different prices for different classes of customers in Canada, the large purchaser receiving a certain price and the small purchaser a higher price; that the practice in the United States was the same as in Canada; that the firm had approximately 200 to 225 customers in Canada; that all the purchasers who bought 100 pairs of skis or more would get the same price; that the first order of the customer in the season would determine his status; that of the 200 or more customers in Canada, approximately 75 per centum of them placed an initial order of 100 pairs of skis or more and they received the same price as the importers in the instant cases; that to the other 50 customers in Canada the prices ranged from 5, 10, 15, or 20 per centum higher, due to the quantity of the order; that repeat orders in the same season were filled at the same prices as the original orders; that during the season 1934 and 1935 more than 50 per centum of the

skis and ski poles were sold at the prices at which the various qualities were invoiced in this case.

On cross-examination the witness testified that T. Eaton Co. was a large purchaser in Canada and received the lowest prices and that there were about eight other customers in Canada who purchased in large quantities but the one-hundred and fifty customers who bought an initial order of 100 or more skis all received the same prices; that the eight large users purchased approximately one-fourth of the skis sold in Canada; that in 1934 and 1935 they did not have many customers in the United States but about half of them gave an initial order for 100 pair of skis and they received the same price as T. Eaton Co. of Canada, the others receiving slightly increased prices.

On redirect examination the witness testified that 80 or 90 per centum of the total ski business in Canada was done by his company during the period herein involved.

Counsel for the Government offered in evidence the two customs agent's reports which had been received as exhibit 1 at the first trial but had been rejected by Division Two because they were not properly authenticated. It appears that they had been certified by the proper officer since the decision by Division Two and before the second trial. Counsel for the plaintiff objected to these reports on the same ground covered by the objection at the original hearing which Judge McClelland overruled on the ground that it related to the weight to be given the exhibits. The objection thereto was taken under advisement by Judge Evans but the objection was overruled in his decision which is published in Reap. Dec. 4722. After reviewing the evidence, the trial court said:

It would seem that the prices at which these skis and ski poles were invoiced and entered were not the freely-offered prices under the statute (section 402 (d) of the Tariff Act of 1930). The language of that section is "freely offered for sale to all purchasers in the principal markets," etc. Can we then say that where the only buyers who could obtain these prices were those who gave an initial order for 100 dozen, the articles were freely offered to all purchasers at the claimed dutiable value? I think not. It is true that the evidence shows that 75 per centum of this firm's customers took advantage of this offer and obtained the lower prices, but we have no evidence of the number of sales made at these prices.

\* \* \* \* \* \* \*

I find upon this record that the merchandise consists of skis and ski poles, of various materials, sizes, and shapes, invoiced and entered at various prices. I further find that the plaintiffs have failed to produce evidence sufficient to sustain the invoice and entered prices and that the reports of the Government agent are not such proof as would enable me to find any values other or different from those found by the appraiser, which are presumptively correct. The presumption of correctness attaching to those values not having been overcome, they are hereby affirmed.

The trial court found that the issue in this case is similar to that in *United States* v. *A. W. Faber, Inc.*, 21 C. C. P. A. 290, T. D. 46817, in which case it appeared that an extra discount of 5 per centum was given by the manufacturer of pencils in Germany to firms purchasing pencils to the value of 3,000 reichsmarks per year and the major portion of the sales were made to the firms making purchases of that amount. The court held that, inasmuch as *all* purchasers did not receive the extra discount, the discount should not be allowed in appraising the merchandise under the provisions of section 402. The court said at page 295:

It is true that the appellate division of the Customs Court found that a majority of the sales made by the manufacturer were to firms entitled to the 5 per centum discount, but that is only saying that a *majority* of those purchasing in the usual wholesale quantities and in the ordinary course of trade, received said discount, while, to conform to the statute defining foreign value, the discount must be offered to *all* purchasers in the usual wholesale quantities and in the 'ordinary course of trade. [Italics quoted.]

The witness Harvey E. Dodds testified that the usual wholesale quantity in which the merchandise was sold in Canada was 100 pairs of skis or over, but it is apparent that he based his conclusion on the fact that he had more customers who purchased 100 pairs or over than customers who purchased a less amount. The courts have held that the major portion or greatest number of sales or offers for sale in a wholesale quantity should be deemed to be the usual wholesale quantity. *United States* v. *Minkus*, 21 C. C. P. A. 382, T. D. 46912. In *United States* v. *Semon Bache & Co.*, 25 C. C. P. A. 387, T. D. 49466, the court held that the testimony of a witness as to what constitutes the usual wholesale quantity in which gauge glasses were sold was of little weight when he was of opinion that sales to retailers should not be considered. The court said at page 394:

Although the witness Sobel testified that the usual wholesale quantities were 1,000 feet or more of the Eureka quality and 500 feet or more of the Hercules quality, and that sales in less than those quantities were not wholesale sales, he also testified, in substance, that both qualities were freely offered for sale and sold to retailers, and to all other purchasers, in less quantities, in the ordinary course of trade, at varying prices, depending upon the quantities purchased.

Obviously, in testifying as to the wholesale quantities and the usual wholesale quantities of such gauge glasses the witness disregarded sales to retailers in quantities less than 1,000 feet of the Eureka quality and 500 feet of the Hercules, evidently being of opinion that sales to retailers in the ordinary course of trade in quantities less than 1,000 feet of the Eureka quality and 500 feet of the Hercules should not be considered sales in wholesale quantities. It is clear, therefore, that the witness had an erroneous conception of what, in the contemplation of law, constitutes *wholesale quantities*, and *usual wholesale quantities* in the ordinary course of trade, and his conclusions in that regard are entitled to no weight. [Italics quoted.]

It is evident from the testimony of witness Dodds in the instant case that he had an erroneous conception of what constitutes usual

wholesale quantities when he based his conclusion on the fact that the majority of his customers made an initial purchase of 100 pairs of skis or more. His testimony as to what constitutes the usual wholesale quantity, therefore, is not entitled to any weight.

Counsel for the appellant argues in his brief as follows:

While it is true that the record does not disclose the exact number of individual transactions which took place, the record does disclose that for each kind of skis and ski poles involved in these importations more than 50% were sold at prices identical with the claimed values here and that those prices were the prices at which any purchaser in Canada could make a purchase of such skis or ski poles in case such purchase consisted of 100 pairs or more, which is the usual wholesale quantity. This testimony, coupled with the testimony that of a total of 200 customers in Canada, 150 of them placed initial orders for 100 pairs or more, conclusively demonstrates that the majority of sales was made upon the claimed basis and at the claimed values.

In *United States* v. *Mexican Products Co.*, 28 C. C. P. A. 80, C. A. D. 129, it was shown that glassware was sold in Mexico at the list price and also at the list price less discounts of from 5 to 15 per centum, the major portion of the sales for the period directly prior to the importation being at 10 or at 15 per centum discount. One sale was made at the list price during the same period. The court held that, since all purchasers did not obtain the discounts, the merchandise should be appraised at the list price without any discount. The court said:

In determining foreign and export values, as defined in section 402 (c) and (d), respectively, it is proper to consider only the market values or prices at which merchandise like or similar to that imported is freely offered for sale *to all purchasers* (not to the greater number, or to those of a particular class) in the principal markets of the country from which exported in the usual wholesale quantities and in the ordinary course of trade. See *United States* v. *A. W. Faber, Inc.*, 21 C. C. P. A. (Customs) 290, T. D. 46819; *Stone & Downer Co.*, v. *United States*, 21 C. C. P. A. (Customs) 479, T. D. 46958; *United States* v. *American Glanzstoff Corp.*, 24 C. C. P. A. (Customs) 35, T. D. 48308.

In the latter case, referring to the definition of "foreign value" in section 402 (c), *supra*, we said:

The expression "all purchasers" does not mean the members of some association only, or 99 per centum of the purchasers of such goods, or those who would not thereafter buy such goods from someone else, but it does mean all of those who cared to buy such goods in such markets.

As there is no evidence of record that merchandise like that here involved was sold or freely offered for sale to *all purchasers* in the usual wholesale quantities and in the ordinary course of trade in the principal market of Mexico, either for consumption in Mexico or for export to the United States, at prices less than the manufacturer's list prices, it should have been held that the proper dutiable values of the involved merchandise are the manufacturer's list prices, plus packing. [Italics quoted.]

In harmony with the principles announced in the decisions cited, we find that the appellant failed to establish foreign or export values in the usual wholesale quantities and in the ordinary course of trade

for the articles herein involved at prices less than the appraised values in this case. The fact that the major portion of the customers in Canada made an initial purchase of 100 pairs of skis or ski poles does not establish that 100 pairs is the usual wholesale quantity. The major portion of the sales (not customers) established the usual wholesale quantity. Furthermore, the record does not show the principal market in Canada because testimony that merchandise is sold from the Atlantic to the Pacific does not establish any principal market.

We hold that the importers failed to overcome the presumption of correctness attaching to the appraisement. The judgment below is affirmed.

### DISSENTING OPINION

Brown, Judge. In this case I find as facts herein as abundantly shown by the record:

(1) That the shipper here involved controlled a very large share of the trade in these articles and fixed the business method of selling both for the home market in Canada and for export.

(2) That the usual wholesale quantity was 100 pairs or more.

(3) That anybody buying 100 pairs or more would receive repeats at the same price whether he took any more or not.

(4) That 75 per centum of the customers who buy the goods in Canada bought 100 pairs or more as initial orders with repeats and over 50 per centum of the customers in America, including the customers here, bought in the same way.

(5) That those buying less than 100 pairs, the usual wholesale quantity, paid varying prices ranging from 5 per centum to 20 per centum higher, but these, as above shown, were greatly in the minority.

Therefore, the great majority of sales and customers buying in the usual wholesale quantities of 100 pairs and repeats should determine the dutiable value as the price they paid both for home consumption and for export, if we are to follow the intention of Congress speaking in the language of business. It is elementary that Congress always so speaks in accord with trade practice in tariff acts.

Otherwise minority sales, out of the usual run, would determine the dutiable prices for the entire business, or in other words the tail would wag the dog.

The appraised values based on invoices reflecting the minority sales should not be sustained but judgment should be in favor of the claimed values which represented sales for 100 pairs, the usual wholesale quantities including repeats.

The cases relied upon by the majority were cases where the purchaser agreed to take a larger quantity during the year.

That has never been held to make market value. That is not the case here. In the case before us 100 is the *usual* wholesale quantity

995

without doubt. Anyone, like the importers here, purchasing 100 or more pays what these importers actually paid.

Anyone purchasing a lesser number, down to a single pair, which latter is, of course, a retail purchase not contemplated by the statute, pays a higher price.

The value which the importer claims, i. e., his invoice value, conforms to the business common sense of the situation, which is what Congress always intends in tariff statutes. The majority holding does not, in my opinion. Instead it squints at what amounts to a retail value, which, if I am correct in that assumption, would seem to be ground for subsequent protest as a finding based upon a wrong principle contrary to law.